# In the United States Court of Federal Claims

No. 24-950
(Filed Under Seal: February 14, 2025)
Reissued: February 26, 2025[1]

|  |  |
|---|---|
| WP HEALTH CONSULTING, LLP, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| THE UNITED STATES, | ) ) ) |
| Defendant. | ) ) |

*W. Brad English*, Maynard Nexsen, PC, Huntsville, AL, for plaintiff.

*Ravi D. Soopramanien*, U.S. Department of Justice, Civil Division, Washington, DC, for defendant.

**OPINION AND ORDER**

**SMITH**, **Senior Judge**

Before the Court in this bid protest are parties' Cross-Motions for Judgment on the Administrative Record. *See generally* Plaintiff's Motion for Judgment on the Administrative Record, ECF No. 21 [hereinafter Pl.'s MJAR]; Defendant's Cross-Motion and Opposition to Plaintiff's Motion for Judgment on the Administrative Record, ECF No. 24 [hereinafter Def.'s CMJAR]. Plaintiff, WP Health Consulting, LLC ("WP Health"), challenges the decision of the procuring agency, the Department of Veterans Affairs ("the Agency"), to eliminate WP Health from competition for Request for Proposals No. 36C10X24R0026 (the "Solicitation"). *See generally* Amended Complaint, ECF No. 20 [hereinafter Am. Compl.]; Pl.'s MJAR.

WP Health argues that it was unduly prejudiced by an "unlawful competitive range decision" when the Agency excluded it from competition without first seeking a Certificate of Competency ("COC") from the Small Business Administration ("SBA"). *See* Pl.'s MJAR at 9–17. WP Health asks the Court to permanently enjoin the award decision. *See* Pl.'s MJAR at 9, 17–18. Defendant counters that the Agency was not legally required to seek a COC before excluding WP Health from the competitive range, and alternatively, even if the Agency did err, WP Health has not sufficiently demonstrated prejudice. *See* Def.'s CMJAR at 19–31.

---

[1]   The Court issued an unredacted version of this opinion under seal on February 14, 2025. Defendant responded to the Court's call for redactions, and this decision reflects the Court's ruling on the proposed redactions.

For the following reasons, the Court grants defendant's Cross-Motion for Judgment on the Administrative Record, ECF No. 24, and denies WP Health's Motion for Judgment on the Administrative Record, ECF No. 21.

## I.   Background

### A.   The Solicitation

On March 18, 2024,[2] the Agency issued the Solicitation for a multiple-award indefinite-delivery indefinite-quantity ("IDIQ") contract titled "Veterans Health Administration ("VHA") Integrated Healthcare Transformation 2.0." AR 1896. The Solicitation was a Service-Disabled Veteran-Owned Small Business ("SDVOSB") set aside. *Id.* The purpose of the contract is to provide "best value healthcare and professional consulting services to VHA through a pool of highly qualified Veteran Integrated contractor Teams" ("VITs"). AR 1910. Under the contract, successful SDVOSBs would serve as "Veteran Integrated Team Agile Leads" ("VITALs") and lead "teaming partners" with the aim of "complet[ing] an organizational transformation" of the VHA to improve healthcare services. *Id.*

The Solicitation outlines four categories comprised of sixty-one capability areas. AR 1915–34. Offerors would be assessed based on price and five non-price factors: VIT full mission capability; VIT robustness, VITAL services, IDIQ key personnel, and task order capability. AR 1966, 1980–81.

"VIT full mission capability" involves a showing of confirmed capability across the four categories and sixty-one capability areas between all VIT members. AR 1982–85. The Solicitation states that "[a] VIT found to not be fully mission capable will not be eligible for award (unless corrected during discussions conducted at the discretion of the Contracting Officer)." AR 1983. "VIT robustness" relates to the "quality and number of VIT members proposed by the offeror" in the categories of capability areas, as compared to those proposed by other offerors. AR 1986. "VITAL services" refers to the offerors' likelihood of successfully providing the three types of services (*i.e.*, delivery of services, healthcare integration, and contract management and administration). AR 1987–90. "IDIQ key personnel" refers to the qualifications of offerors' proposed key personnel. AR 1991. Task order capability is determined by the Agency's confidence in offerors' capabilities and proposed approaches for the two sample task orders provided in the solicitation. AR 1992–97.

The Solicitation stated that the Agency would make the award using a best value tradeoff, which would consider all non-price factors combined to be significantly more important than price. AR 1966, 1980–81. The evaluation would be divided into two phases. In Phase I, the Agency would implement an "advisory down select process" to evaluate offerors based on their

---

[2]   Due to its size, the Administrative Record ("AR") was electronically shared with the parties and the Court via the Justice Enterprise Files Sharing ("JEFS") system. Citations to AR page numbers refer to the AR document pagination as reflected in the JEFS file.

The Agency amended the solicitation several times. *See* Administrative Record 29, 370, 400, 716, 717, 848, 850, 975, 983, 984, 1860, 1865, 1896, 2706 [hereinafter AR]. Citations to the solicitation refer to the latest version released on April 30, 2024. AR 1896–2703.

written demonstrations of VITAL eligibility, VITAL Category 1 capability, and VIT Category 4 capability. AR 1967. At the end of Phase I, the Agency would provide each offeror with an Advisory Notification. AR 1967, 1971–79. The Advisory Notification would advise offerors on whether the Agency finds them to be a "viable competitor for the result of Phase II of the acquisition" along with the "general basis for that opinion." AR 1973. A negative Advisory Notification would not preclude offerors from participating in Phase II of the competition, but all offerors were required to submit materials during Phase I to be eligible to submit a proposal for the Phase II evaluation. AR 1971, 1973, 1980. In Phase II, the Agency would evaluate offerors based on their written responses across all categories and capability areas as well as a scenario-based technical demonstration. AR 1967, 1980–99.

The Agency reserved the right to make awards to successful offerors with or without discussions during Phase II of the procurement. AR 1967. The Agency further reserved the right to establish a competitive range for discussions, if deemed necessary, as well as the right to reduce the number of offerors included in the competitive range, in accordance with FAR 15.306(c), as needed to conduct an efficient competition. AR 1967. The Agency stated that it intended to award at least four, but no more than eight, contracts. AR 1966.

### B.     The Agency's Phase I Determination

Phase I began on March 18, 2024, when the Agency posted the Solicitation on SAM.gov. AR 29. Between April 8, 2024, and April 12, 2024, the Agency received twenty-three responsive Phase I proposals. AR 32890. In evaluating these submissions, the Agency masked the identities of offerors and rated each offerors' factors on a scale of one to five, where one represented low confidence, and five represented high confidence. *Id.* These factor scores were weighted according to the following formula:

> 0.50 x (avg of VITAL service areas) + 0.30 x (avg of 7 Category 4 areas) + 0.20 x (avg of 3 Category 1 areas) = weighted score

AR 32891. The Agency then ranked the masked offerors according to this weighted score. *Id.* The Agency next sought to identify a clear group within the ranked scores that would have predicted success for award. AR 32892. To do this, the Agency relied on two-phase IDIQ competition procedures and its own goal of making four to eight awards. *Id.*

On April 16, 2024, the Agency distributed Advisory Notices as follows: nine offerors received positive "reasonable chance for award" viability letters; five offerors received negative "low chance for award" viability letters; five offerors received negative "very low chance for award" viability letters; and three offerors received negative "almost no chance of award" viability letters. AR 32892–93. WP Health ranked eighteenth out of the twenty-three responses, receiving a negative viability letter that predicted a "very low chance for award." AR 32892.

### C.     The Agency's Phase II Evaluation to Date

Phase II began on April 18, 2024, when the Agency issued Amendment 0005. AR 983, 32894. The Agency received eleven responsive proposals for Phase II. AR 32894. Only two offerors who received negative viability letters submitted Phase II proposals, including WP

Health.  *Id.*  The Agency Evaluation Team evaluated the Phase II proposals between May 10, 2024, and June 7, 2024.  AR 32897.  The Evaluation Team separately assessed each offeror—using confidence rankings of High, Some-High, Some, Some-Low, and Low—for each of the six criteria as follows:

    **(1) VIT Full Mission Capability:** The Agency evaluated its confidence in the offerors' categories of capability areas and identified gaps to determine overall full mission capability confidence.  AR 32899.  WP Health and one other offeror, ▇▇▇▇▇▇▇, received "Low" overall full mission capability, although ▇▇▇▇▇▇▇ did score higher in certain areas than offerors who had a wholistically higher confidence ranking.  *Id.*  WP Health did not receive a score in any category higher than competing offerors, except for scoring higher than ▇▇▇▇▇▇▇ in Category 3.  *Id.*  WP Health had more capability gaps across the sixty-one capability areas than any other offeror, with seventeen total gaps.  *Id.*  ▇▇▇▇▇▇▇ had twelve gaps across the capability areas, whereas the next highest number of gaps was six.  *Id.*

    **(2) VIT Team Robustness:** The Agency compared and ranked each offeror for their vetted partners, partner coverage, level of confidence, and instances of full mission capability.  AR 32901–02.  The Agency then calculated a weighted robustness ranking for each offeror using their scores in these four elements to arrive at a final "comparative robustness ranking and relative confidence" for each offeror.  AR 32902.  WP Health ranked tenth, only above ▇▇▇▇, receiving a confidence score of "Some-Low" for this factor.  AR 32904.

    **(3) VITAL Services:** The Agency accessed each offeror's proposed delivery of services, health care integration, and contract management and administration.  AR 32905–08.  The Agency then determined an overall VITAL Services confidence score using these three area scores.  *Id.*  WP Health received "Low" confidence in the first two areas and "Some-Low" in the third, resulting in an overall VITAL Services score of "Low."  AR 32908.

    **(4) IDIQ Key Personnel:** The Agency's evaluation of WP Health's proposed IDIQ key personnel against the qualification requirements resulted in a rating of "Some-High" confidence.  AR 32910.  WP Health ranked fifth among offerors in this area.  *Id.*

    **(5) Task Order Capability:** The Agency evaluated WP Health with a confidence level of "Some" across each evaluation area for the sample task orders, except for one where it scored "Some-Low."  AR 32911–15.  This resulted in WP Health's Task Order Capability Confidence level of "Some."  AR 32915.  Only one other offeror received a lower rating of "Some-Low."  *Id.*

    **(6) Price:** The Agency's price evaluation included analyzing the base IDIQ pricing across labor categories as well as a price reasonableness evaluation for the two sample task orders.  AR 32916–17.  WP Health ranked tenth in this evaluation.  AR 32917.  The Agency determined that fourteen of WP Health's IDIQ labor category rates were not fair

and reasonable. *Id.* WP Health was the only offeror to have both sample task orders' pricing determined to be not fair and reasonable. *Id.*

The Agency summarized its evaluation in the table below:

| Offeror | Weight 1 VIT FMC | 2 VIT Robustness | 3 VITAL Services | 4 Key Personnel | 5 Task Order Capability | Pricing IDIQ LCATs not F&R | STO1 | STO2 |
|---|---|---|---|---|---|---|---|---|
| | High | High | Some-High | Some-High | Some | 7 | F&R | Not F&R |
| | Some-High | High | Some-High | High | Some-High | 1 | F&R | F&R |
| | Some-High | High | Some-High | Some | Some-High | 9 | F&R | F&R |
| | Some-High | Some-High | Some-High | Some | Some-High | 4 | F&R | F&R |
| | Some-High | High | Some | Some | Some-High | 0 | F&R | F&R |
| | Some | Some-High | Some | Some | Some | 20 | F&R | F&R |
| | Some | Some-High | Some | Some | Some-Low | 0 | F&R | F&R |
| | Some | Some-High | Some-Low | Some | Some | 0 | F&R | F&R |
| | Some | Some | Some | Some-High | High | 1 | F&R | F&R |
| | Low | Some-Low | Some | High | Some | 2 | F&R | F&R |
| WP Health Consulting | Low | Some-Low | Low | Some-High | Some | 14 | Not F&R | Not F&R |

AR 32918.

On June 10, 2024, the Contracting Officer issued a competitive range determination. AR 32919–20. The Contracting Officer determined that two offerors, WP Health and ▇▇▇▇▇▇, "were not among the most highly rated and should therefore be outside of the competitive range." AR 32919. The Contracting Officer explained that WP Health's proposal had the lowest government confidence among all offerors for VIT Full Mission Capability, VIT Robustness, and VITAL Services. *Id.* Furthermore, even though WP Health ranked "among the strongest" for IDIQ Key Personnel, that "factor was much less significant than the most heavily weighted factors." *Id.* WP Health's pricing was determined to be similarly poor as it "had the second highest number of [IDIQ pricing rates] that could not be determined [to be] reasonable," and neither of its sample task orders "could be determined to be fair and reasonable." *Id.* Given the goal of making between six and eight awards, the Contracting Officer determined that nine offerors, but not WP Health, had "a reasonably high likelihood of award if able to make improvements to their respective proposals based on meaningful discussions." *Id.*

On June 14, 2024, the Agency sent WP Health and ▇▇▇▇▇▇ notifications that they were excluded from the competitive range and would no longer be considered for award. AR 32921. WP Health subsequently filed this protest. *See* Pl.'s MJAR at 9.[3]

### D.   Procedural History

On June 21, 2024, WP Health filed its Complaint in this Court, alleging that the Agency unreasonably excluded it from the competitive range. *See* Compl. at 12–14, ECF No. 1. On July

---

[3] As far as the Court is aware, the Agency's evaluation of the remaining offerors is ongoing, and the Agency has not yet made an award decision.

22, 2024, the Agency produced the Administrative Record.  *See generally* Notice of Filing Administrative Record, ECF No. 19.  On August 5, 2024, WP Health filed its Amended Complaint and its Motion for Judgment on the Administrative Record ("Motion").  *See generally* Am. Compl., ECF No. 20; Pl.'s MJAR, ECF No. 21.  On August 26, 2024, the Agency filed its Cross-Motion for Judgment on the Administrative Record ("Cross-Motion") and Response in opposition to WP Health's Motion.  *See generally* Def.'s CMJAR, ECF No. 24.  On September 4, 2024, WP Health filed its Reply in support of its Motion and Response in opposition to the Agency's Cross-Motion.  *See generally* Plaintiff's Response and Reply in Support of Its Motion for Judgment on the Administrative Record, ECF No. 27 [hereinafter Pl.'s Reply & Resp.].  On September 11, 2024, the Agency filed its Reply in support of its Cross-Motion.  *See generally* Defendant's Reply to Plaintiff's Response to Defendant's Cross-Motion for Judgment on the Administrative Record, ECF No. 28 [hereinafter Def.'s Reply].  On November 21, 2024, the Court held oral argument.

## II.     Standard of Review

### A.     Subject-Matter Jurisdiction

The Tucker Act grants this Court subject matter jurisdiction over bid protests.  *See* 28 U.S.C. § 1491(b) ([T]he Unite[d] States Court of Federal Claims . . . shall have jurisdiction to render judgment of an action by an interested party objecting to a solicitation by a Federal agency . . .").  The Court adheres to the Administrative Procedure Act's ("APA's") standard for agency actions when reviewing bid protests.  *See* 28 U.S.C. § 1491(b)(4) (incorporating 5 U.S.C. § 706 into the Tucker Act); *see also Harmonia Holdings Grp., LLC v. United States*, 20 F.4th 759, 766 (Fed. Cir. 2021).

Under the APA standard, the Court must set aside agency actions where it finds such actions to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  *See Harmonia Holdings Grp.*, 20 F.4th at 766 (citing *Palantir USG, Inc. v. United States*, 904 F.3d 980, 989 (Fed. Cir. 2018)) (internal quotations omitted).  To sustain a protest, the Court must either determine that "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  *See Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (internal citations omitted) [hereinafter "*Impresa*"].  Importantly, contracting officers have "discretion" across a "broad range of issues" during a procurement, and a protestor "bears a heavy burden of showing that the award decision had no rational basis."  *See id.* at 1332–33.  When a protestor challenges a procurement on the second ground, it must show that "a clear and prejudicial violation of applicable statutes or regulations" took place.  *See id.* at 1333 (quoting *Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (1973); *see also Cent. Ark. Maint. v. United States*, 68 F.3d 1338, 1342 (Fed. Cir. 1995) ("[N]ot all violations of statute and regulation are the same; only a 'clear and prejudicial' violation of a procurement statute or regulation warrants relief.") (quoting *CACI Field Servs., Inc. v. United States*, 854 F.2d 464, 466 (Fed. Cir. 1988)).

### B. Statutory Standing in Pre-Award, Post-Proposal Submission Bid Protests

Bid protests before the Court also include non-jurisdictional statutory standing requirements. *See CACI Inc.-Federal v. United States*, 67 F.4th 1145, 1151 (Fed. Cir. 2023). To have statutory standing in a bid protest under the Tucker Act, the protestor must demonstrate that it is an "interested party" by showing that it is "an 'actual or prospective . . . offeror[] whose direct economic interest would be affected by the award of the contract or by failure to award the contract.'" *See id.* at 1151 (quoting *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006)).

In a pre-award bid protest, "direct economic interest" is established by showing that the protestor "had a 'substantial chance' of winning the contract," *Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1348 (Fed. Cir. 2013) (quoting *Rex. Serv. Corp*, 448 F.3d at 1308), unless the protestor is challenging the solicitation prior to proposal submission and agency evaluation, which calls for the lesser standard of showing a non-trivial competitive injury, *id.* (citing *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1361 (Fed. Cir. 2009)). Because the lesser standard of showing a non-trivial competitive injury is reserved for protests initiated before proposal submission and agency evaluation, it is not applied in protests initiated after proposal submission and agency evaluation. *See Orion Tech., Inc.*, 704 F.3d at 1348–49. Thus, when a party files a protest with the Court before award, but after proposal submission and agency evaluation, the "substantial chance" standard applies. *See id.* at 1349.

### C. Motion for Judgment on the Administrative Record

When reviewing motions under Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC"), the Court conducts a "trial on the paper record." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). In doing so, the Court is limited to the administrative record, *id.*, and "asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *Savantage Fin. Servs. v. United States*, 150 Fed. Cl. 307, 317 (2020) (internal quotations and citations omitted).

## III. Discussion

The main issue before the Court is whether the Agency violated Federal Acquisition Regulation ("FAR") section 19.601(c) and 13 C.F.R. § 125.5 by using a *non*-comparative analysis of responsibility factors in excluding WP Health from the competitive range, without seeking a COC from the SBA. The court holds that the Agency used a comparative analysis and was thus not required to refer WP Health to the SBA. The Court also holds that WP Health fails to show prejudice required for bid protest actions as well as prejudice for demonstrating a direct economic interest required for statutory standing under the Tucker Act. Each issue is discussed below.[4]

---

[4] The Agency also makes other arguments regarding WP Health waiving its argument due to the patent ambiguity doctrine. *See* Def.'s CMJAR at 28–29, ECF No. 24. The Court does not reach those arguments because it finds for the Agency on other grounds.

### A.   The Agency Was Not Required to Refer WP Health to the SBA for a COC Before Establishing the Competitive Range.

WP Health's primary argument is that the Agency acted unlawfully by excluding WP Health from the competitive range without first seeking a COC from the SBA. The Court is not persuaded. The SBA's COC program aims to assist small businesses in obtaining contracts with the federal government. *See PMCG Collaborateup JV LLC v. United States*, 171 Fed. Cl. 784, 800 (2024). Part 19 of the FAR and Title 13 of the Code of Federal Regulations ("C.F.R.") govern the procedures of the COC program. The program, which applies to "all [g]overnment acquisitions," dictates that "[a] contracting officer shall, *upon determining an apparent successful small business offeror to be nonresponsible*, refer that small business to the SBA for a possible COC . . . ." FAR 19.601(c) (emphasis added). Federal regulation requires that this referral take place where the Agency:

> "(i) Denies an *apparent successful small business offeror* award of a contract or order on the basis of responsibility . . . ;
>
> (ii) Refuses to consider a small business concern for award of a contract or order *after evaluating the concern's offer on a non-comparative basis* (e.g., a pass/fail, go/no go, or acceptable/unacceptable) under one or more responsibility type evaluation factors . . . ; or
>
> (iii) *Refuses to consider* a small business concern for award of a contract or order because it failed to meet a definitive responsibility criterion contained in the solicitation."

13 C.F.R. § 125.5(a)(2) (emphasis added). WP Health relies heavily on the second regulatory requirement in its protest, but because it somewhat blurs the line between each of the three, the Court will discuss each. *See generally* Pl.'s MJAR.

### i.   13 C.F.R. § 125.5(a)(2)(ii)

Regarding the second regulatory requirement for an SBA referral, WP Health argues that the Agency's action was "unreasonable and unlawful" because it eliminated offerors on a pass/fail basis for failing to satisfy a responsibility type factor without first seeking a COC from the SBA. Pl.'s MJAR at 10–15. WP Health claims that the only offerors excluded from the competitive range were "flatly ineligible for award [because of] their Low Confidence in Factor 1," thus prompting the referral requirement for pass/fail treatment. *Id.* at 14. The Agency argues that it did not use any responsibility type factor as a pass/fail threshold requirement for establishing the competitive range, and instead used a comparative approach that evaluated offerors' submissions wholistically in a best value tradeoff analysis.[5] *See* Def.'s CMJAR at 24–28.

---

[5]   Additionally, the Agency raises an argument regarding the team-wide nature of its evaluation, creating an exception to the SBA COC referral requirement. *See* Def.'s CMJAR at 23. The Court does not reach that argument.

The primary issue here is whether the evaluation of Factor 1 was sufficiently comparative, with no pass/fail treatment, to avoid triggering the regulatory SBA referral requirement. 13 C.F.R. § 125.5(a)(2)(ii). The Court concludes that it was. The record shows that (1) nothing in the Solicitation stated that the Agency would use a pass/fail evaluation; and that (2) the Agency indeed did not use a pass/fail evaluation, and instead relied on a wholistic comparison of each offeror's different ratings across multiple factors to establish the competitive range. AR 32918–20.

WP Health claims that the Solicitation requirement for Factor 1, VIT Full Mission Capability, that an offeror "found to not be fully mission capable will not be eligible for award," AR 1983, "plainly" requires the Agency to use a non-comparative test. Pl.'s MJAR at 12–13. This language prohibits the Agency from ultimately awarding a contract to an offeror determined to not be fully mission capable. However, it does not necessarily require the Agency to equate a "Low" confidence rating for Factor 1 as a "fail" in a "pass/fail" test when establishing the competitive range. AR 32919; 13 C.F.R. § 125.5(a)(2)(ii). More importantly, the Agency's actions show that it did not use a pass/fail test for any one factor in establishing the competitive range, but rather a *comparative* evaluation of *multiple* factors, as explained below. AR 32918–20.

WP Health also argues that the Agency must have excluded it from the competitive range solely because of its "Low" Factor 1 rating given that the only two offerors who were excluded from the competitive range were the only two offerors with "Low" Factor 1 ratings. AR 32919. This confuses correlation with causation and is contradicted by the record. WP Health focuses on that fact that the only two offerors excluded from the competitive range received "Low" confidence ratings in Factor 1. However, that does not necessarily mean that they were excluded from the competitive range *because of* their poor Factor 1 ratings. Indeed, the Contracting Officer explained that WP Health's poor Factor 1 rating was not the sole reason on a pass/fail basis for its exclusion. AR 32919. Instead, WP Health was excluded from the competitive range because it scored poorly in the most important nonprice factors, and on the price factor. *Id.* And the Agency made this decision after wholistically comparing multiple factors, rather than exclusively relying on WP Health's Factor 1 rating. AR 32918–20.

A detailed inspection of the Contracting Officer's analysis confirms that WP Health was excluded after a comparative evaluation. "A 'comparative evaluation' is one with 'competing proposals [that] will be rated on a scale relative to each[]other, as opposed to a pass/fail basis." *Optimization Consulting, Inc. v. United States*, 115 Fed. Cl. 78, 100–01 (2013) (quoting *Nomura Enterprise, Inc.*, B-277768, 97-2 Comp. Gen. Proc. Dec. ¶ 148 at 3 (Nov. 19, 1997)). Here, the Contracting Officer explained that the Agency decided to hold discussions and establish a competitive range because, after the completion of Phase II, all offerors "had some labor rates that [were] considered too high." AR 32918. During the analysis, the Agency compared confidence ratings across all factors and all offerors. AR 32880–33175. After the Agency summarized the evaluations of all offerors in a table, rated from highest to lowest based on non-price factors, the Contracting Officer stated that the competitive range would be "comprised of the most highly rated proposals . . . [b]ased on the evaluation results." AR 32919. Only then did the Contracting Officer "determine[] that WP [H]ealth and ▮▮▮▮▮▮▮ were not among the most highly rated and should therefore be outside of the competitive range." AR 32919. The

9

Agency's best value tradeoff is inherently a comparative evaluation: the Agency considered multiple factors for each offeror, assigned each factor a rating, and wholistically assessed each offeror by weighing the strengths and weaknesses of each offerors' different ratings. *See* AR 1980.

In sum, WP Health was not excluded from the competitive range based on its failure to meet a pass/fail requirement. Because the Agency used a comparative analysis, it was not required to make an SBA referral under the second regulatory requirement, 13 C.F.R. § 125.5(a)(2)(ii), before eliminating WP Health from the competition. *Compare with KWR Constr., Inc. v. United States*, 124 Fed. Cl. 345, 362 (2015) ("If the agency had rejected KWR based on the ground stated as part of a trade-off analysis, the agency's determination might have been sustained . . . . However, by rejecting KWR's proposal outright based on responsibility concerns, the agency's decision amounted to a de facto responsibility determination which should have been referred to the SBA."). The second regulatory requirement for an SBA referral therefore does not apply.

### ii.     13 C.F.R. § 125.5(a)(2)(i) and (iii)

WP Health also fails on the remaining regulatory requirements for SBA referral, 13 C.F.R. § 125.5(a)(2)(i) and (iii). WP Health is not an apparent successful offeror, thus, the first requirement for an SBA referral under the regulation does not apply. *See* 13 C.F.R. § 125.5(a)(2)(i). Under the first regulatory requirement, an Agency must make a referral to the SBA where it denies "an *apparent successful* small business offeror" award of a contract due to responsibility concerns. *Id.* (emphasis added). Because WP Health received a negative Phase I viability letter and faced relatively negative confidence determinations by the Agency for each evaluation criteria, save one, WP Health has not demonstrated that it is an apparent successful offeror. AR 32897–919, 32977–82, 33992–94, 33011–12, 33037–38, 33119–27, 33139, 33161–63, 33172; *see generally* Pl.'s MJAR. Thus, the first regulatory requirement for an SBA referral is inapplicable.

Lastly, the Agency did not refuse to consider any offeror for inclusion in the competitive range, thus, the third requirement also does not apply. 13 C.F.R. § 125.5(a)(2)(iii). Under the third regulatory requirement, an Agency must refer a small business to the SBA where it "*refuses to consider*" the small business offeror for award of a contract because of responsibility. *Id.* (emphasis added). While the Solicitation did include a definitive responsibility criterion—that offerors must demonstrate full mission capability to be eligible for award—the record shows that the Agency conducted a comprehensive evaluation of all offerors. AR 1983, 32880–3175. Indeed, WP Health's proposal was extensively examined, and a combination of factors lead to its exclusion from the competitive range. AR 32880–3175. WP Health has therefore not demonstrated that the Agency failed to consider its proposal, and the third regulatory requirement for an SBA referral does not apply.

### B. Prejudice

WP Health never had a "substantial chance of winning the contract," *Orion Tech., Inc.*, 704 F.3d at 1348–49 (internal quotation marks omitted), because it was not within the reasonable range of being awarded the contract, *e.g.*, *Universal Marine Co., K.S.C. v. United States*, 120 Fed. Cl. 240, 248–49 (2015), and was thus not "significant[ly] prejudice[d]" by the Agency's acquisition process. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1353 (Fed. Cir. 2005). The solicitation is clear: The Agency anticipated awarding between four and eight contracts. AR 1966. The Agency received proposals from eleven offerors during Phase II and chose nine of those offerors to be in the competitive range. AR 32894; AR 32919–21. WP Health always ranked below *all* other offerors on most factors and overall, so, literally, every other offeror had a better chance of winning one of the awards. AR 32919–20. Additionally, a COC from the SBA only shows a general level of responsibility and may be used as "evidence" to support a favorable evaluation of responsibility type factors, *see*, *e.g.*, *Lawson Env't Servs., LLC v. United States*, 126 Fed. Cl. 233, 247 (2016), but that does not mean that the Agency must make the same determination for specific responsibility type factors in a specific procurement. If referred, WP Health could have received a favorable COC determination from the SBA while also receiving an unfavorable technical evaluation from the Agency. Thus, without explaining how a COC from the SBA would have improved its ratings and warranted its inclusion in the competitive range, or even why it would have received a COC from the SBA in the first place, *see* Pl.'s MJAR at 16, the Court cannot accept such conclusory allegations. Prejudice is therefore not established.[6]

## IV. Conclusion

For the reasons discussed above, WP Health's Motion for Judgment on the Administrative Record is hereby **DENIED** and defendant's Cross-Motion for Judgment on the Administrative Record is hereby **GRANTED**. The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ *Loren A. Smith*

Loren A. Smith,

Senior Judge

---

[6] WP Health also requests a permanent injunction. *See* Pl.'s MJAR at 17–18, ECF No. 21. Because WP Health fails on the merits, a permanent injunction is not warranted.